FISSE v. TOYE BROS. AUTO & TAXICAB CO. ET AL.

(June 16, 1930. Opinion and Decree.)
(July 23, 1930. Rehearing Refused.)

Weiss, Yarrut & Stich, of New Orleans, attorneys for plaintiff, appellee.

John P. Sullivan and David Sessler, of New Orleans, attorneys for Toye Bros., defendants, appellants.

Alex W. Swords, of New Orleans, attorney for Fred Roses.

HIGGINS, J. Plaintiff as a passenger in a taxicab brings this suit for damages for personal injuries alleged to have been sustained as a result of an intersectional collision between the taxicab and a Ford sedan at the corner of Dumaine street and North Claiborne avenue, this city, on January 4, 1927, at 7:30 p. m. The suit is against the owners of the taxicab and the Ford sedan.

There was judgment in favor of plaintiff against the defendants in solido in the sum of $2,500, and both defendants have appealed.

After carefully reviewing the record, we see no reason to change our views expressed in the case of Hortense Fisse v. Toye Bros. et al. (La. App.) 127 So. 756, decided April 21, 1930, where the same issues and parties defendant were involved.

But counsel for the defendant Fred Roses, the driver and owner of the Ford car, contends that section 12 of article VIII, C. C. S. 7490, should be read in connection with subdivisions (c) and (d) of section 7 of article I, C. C. S. 7390.

Section 12 of article VIII provides:

"Drivers and operators of all vehicles are required to observe the instructions on the official traffic signs. These signs designate one way streets, open zones, quiet zones, speed limits, limits of parking space, dangerous street intersections, and other locations where caution should be observed."

Subdivisions (c) and (d) of section VII of article I, 7490 C. C. S. read as follows:

"(c) At intersections of right of way streets with one another, all vehicles approaching intersecting streets from the left shall give right of way to vehicles approaching from the right."

"(d) On streets and avenues having neutral grounds and carrying street car lines, vehicles crossing such neutral grounds shall have right of way to complete the crossing of the roadway of such street or avenue under the following conditions:

"Provided the vehicle shall come to a full stop when about to leave the neutral ground and enter the roadway, shall signal with horn, and give opportunity for approaching vehicles in the roadway to come to a stop; it being the intention of this provision to require vehicles in said roadway to stop upon receiving reasonable warning in order that the vehicles standing on the neutral ground shall be permitted to complete the crossing or turning into the roadway."

The legal question thus presented is whether regulations instituted by the police department under section 12 of article VIII, C. C. S. 7490, supersedes or suspends, at a particular intersection, the provisions of the general traffic ordinance, and par-

ticularly paragraphs (c) and (d) of section 7 of article I, 7490 C. C. S.

The record shows that the taxicab was traveling on North Claiborne avenue in the direction of Canal street, and the Ford sedan was being driven on Dumaine street in the direction of the lake, and that the collision occurred on the uptown lake corner of the intersection. North Claiborne avenue has a neutral ground with car tracks in the center. There are also car tracks on Dumaine street.

The traffic sign "stop" is painted in large white letters on the pavement of the lake thoroughfare of North Claiborne avenue, near the corner of Dumaine street.

It is argued by counsel for defendant Roses that, as the taxicab was obliged to stop in obedience to the painted traffic sign, there was no necessity for Roses to stop or blow his horn before leaving the neutral ground to cross the lake intersection of North Claiborne avenue, and that it was not the intention of the ordinance to require a driver under such circumstances to blow his horn before leaving the neutral ground, as he was relieved of that duty by the particular traffic sign painted in the roadway, that there would be no necessity for both drivers to stop, and that the general rule is superseded by the special one.

We are without any decision to guide us on this issue, as it appears to be raised for the first time. But an examination of the pertinent parts of the traffic ordinance in question do not indicate that the provisions of section 12 of article VIII shall supersede or suspend the provisions of the general ordinance, and particularly subdivisions (c) and (d) of section 7 of article I, 7490 C. C. S., at particular street intersections, and we must therefore assume that the commission council did not intend that such should be the case.

It would appear to us that it was the intention and purpose of the framers of the ordinance to require extraordinary care and vigilance by drivers of vehicles at dangerous street intersections, so that chances of collision would be lessened, by requiring unusual precaution on the part of drivers approaching from both directions.

These provisions of the ordinance are not in conflict. Neither provision supersedes or suspends the other, and both are operative and should be obeyed.

The driver of the taxicab would have as much right to presume that the driver of the Ford car would obey the traffic ordinance as the driver of the Ford car would have a right to presume that the driver of the taxicab would obey the traffic sign. Since it is clearly established that neither driver obeyed the traffic law, we are still of the opinion originally expressed that the accident was caused through the negligence of both drivers.

As to the damage sustained, the record shows that the plaintiff, a white man, aged 64 years, had been suffering from diabetes and arteriosclerosis for several years prior to the date of the accident. His physician, Dr. Danna, had ordered him to the hospital because he was threatened with gangrene of the right foot. He was on his way to the hospital with his foot bandaged when the accident occurred. The taxicab was overturned with considerable violence and force, and the plaintiff suffered general contusions and bruises as well as a severe contusion to the right thigh. He was knocked unconscious when his head struck one of the glasses which broke, bruising his head. The taxicab had to be righted with the occupants still in it, and the plaintiff was then removed to the Hotel Dieu. At first it was thought that his leg had been broken, but subsequently this was discovered to have been

an error. It appears that he suffered severe pain for some period after the accident.

While it is contended that the diabetic and arteriosclerotic condition was aggravated and accelerated by the accident resulting in the amputation of some of the toes of the right foot on May 4, 1927, and then again on September 1, 1927, and in the amputation of the right foot between the knee and the ankle on December 5th 1927, the medical testimony does not warrant us in holding such to be the case. Dr. Danna, the attending physician, said that it is possible that the trauma aggravated the diabetic and arteriosclerotic condition, and resulted in the amputation of the foot sooner than it would otherwise have been necessary to do so, but he was not positive that such was the case.

The defendants' medical expert, Dr. Martin O. Miller, testified that in his opinion the threatened gangrene condition from which plaintiff was suffering at the time he was on his way to the hospital was the sole cause of the amputation, and that the accident was not responsible for the aggravation or acceleration or development of the disease. It was admitted that, if Dr. Morrel W. Miller were placed on the stand, he would give corroborative testimony. We are therefore of the opinion that the amputation of the toes and the right leg was directly attributable to the diabetic and arteriosclerotic condition of plaintiff and the gangrene condition which had set in his foot.

The record shows that the plaintiff, on account of his sickness, had been unable to work for several years before the accident, and that he had spent a considerable portion of his time in the hospital. We believe, however, that the plaintiff suffered more excruciating pain and for a greater period of time than an ordinary healthful person would have suffered under the circumstances.

The trial court allowed the sum of $2,500, but, in view of the fact that the amputations were not caused by the injury received in the accident, we believe this amount to be excessive. We are of the opinion that $750 would be adequate compensation for the pain suffered resulting from the injury as a result of the accident.

Plaintiff owes Dr. Danna a bill for medical services, as a result of the accident, in the sum of $100, which we also will allow.

For the reasons assigned, it is therefore ordered, adjudged, and decreed that the judgment of the lower court be amended by reducing the amount awarded plaintiff from $2,500 to $850, and, as thus amended, it is affirmed, at appellants' cost.